UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RICHARD SCHMITT

          Plaintiff,

  v.

NIC INSURANCE COMPANY,
NAVIGATORS INSURANCE COMPANY

          Defendants.
_____/

No. C 06-5837 MHP

**MEMORANDUM & ORDER**
**Re: Cross-Motions for Summary Judgment**

      This action was initiated in state court and removed to this court based on diversity jurisdiction. On July 21, 2006 plaintiff Richard Schmitt dba Schmitt Construction ("Schmitt") filed its first amended complaint against NIC Insurance Company ("NIC") and Navigators Insurance Company contending that NIC had a duty to defend and indemnify Schmitt with respect to claims brought by Gidha & Gidha ("Gidha") and adjudicated by the American Arbitration Association in case no. 74-110-00926-05-SUBR (the "underlying arbitration"). Now before the court are the parties' cross-motions for summary judgment. The court has considered the parties' arguments fully, and for the reasons set forth below, the court rules as follows.

BACKGROUND[1]

      On April 15, 2003 plaintiff Schmitt, a general contractor, applied for an insurance policy from defendant NIC, an insurance company. The policy period was from June 30, 2003 to June 30, 2004, and the annual premium was $55,275. Schmitt Dec. ¶ 7. On April 21, 2004 Schmitt renewed this policy for a term from June 30, 2004 to June 30, 2005, at an annual premium of $51,763.21. Id., ¶ 8.

      When applying for insurance, Schmitt represented both times that it always complied with

the following three liability limiting practices: 1) obtaining written subcontracts with hold harmless provisions from all of its subcontractors; 2) obtaining certificates from each of its subcontractors that they had commercial general insurance of at least $1 million; and 3) making sure it was named as an additional insured on all its subcontractors' insurance policies.[2] Based on these representations, NIC issued insurance policies to Schmitt.[3] These policies required NIC to defend and indemnify Schmitt against any suit claiming property damage against property to which the policy applied. Vaughn Dec., Exhs B at 18 & F at 21.[4] The policies also included an independent contractor endorsement, which made adherence to the above listed liability limiting practices an ongoing requirement. To this end, the policy limited its defense and indemnification coverage for work done on or behalf of the insured to be in excess of the $1 million policy limit required of subcontractors.[5]

On February 9, 2004 Schmitt entered into a building construction contract with Gidha to construct a commercial building. Schmitt Dec., Exh. A. It hired independent subcontractors River City Erectors ("River"), Madsen Plastering ("Madsen") and National Garage ("National"). River erected the building and installed the metal roof, Madsen installed the exterior stucco, and National furnished and installed a steel garage door. The parties do not contest that, contrary to the liability limiting practices, Schmitt did not acquire written contracts with hold harmless provisions in Schmitt's favor from River and Madsen nor was Schmitt listed as an additional insured on River or Madsen's policies. With respect to National, Schmitt did not fulfill any of the three liability limiting practices. Further, it is uncontested that in 2003 and 2004, NIC did not issue policies if its proposed insured failed to always engage in all three liability limiting practices. Vaughn Dec. ¶¶ 9, 18, 20.

On October 14, 2004 Schmitt filed its notice of completion. Schmitt Dec., Exh. D. Around the same time, Gidha directly hired Atlantic HVAC ("Atlantic") to perform heating, ventilation and air-conditioning work on the building. Specifically, Atlantic started working on the building in August 2004 and conducted the bulk of its work after Schmitt filed its notice of completion. Schmitt Dec. ¶ 19.

In Spring 2005, Gidha threatened Schmitt with litigation. Id. ¶ 23. Gidha's demand letter of July 6, 2005 alleged that: 1) the gutter on the eastern side of the building was improperly designed or

2

1  installed allowing water to overflow onto the stucco and enter the building causing damage and
2  mold growth; 2) the attic space was not properly ventilated, causing moisture to condense on the
3  interior of the walls and mold growth; and 3) the concrete slab was exhibiting excess moisture
4  requiring remediation. Def.'s Request for Judicial Notice, Exh. B.[6] On September 30, 2005 Gidha
5  formally initiated arbitration proceedings. Schmitt Dec., Exh. I. The claim was for "designing
6  and/or constructing the building so as to allow moisture to enter into or accumulate in the interior of
7  the building, causing damage and mold growth." Id.

8      Schmitt advised NIC of this threat in late May 2005 and NIC retained P&C claims service
9  agency ("P&C") to investigate the claim. Schmitt Dec., Exh. G & ¶ 24. Schmitt informed P&C that
10 Gidha's primary claim was for water intrusion that Schmitt did not cause. Id. ¶ 24 & Exh. H.
11 Schmitt further informed P&C that it had substantially completed the building in September 2004,
12 before the claims for water damage arose. Id. ¶ 24. The insurance policies in question excluded
13 any defense or indemnification coverage for damage caused by mold.[7] This was in addition to
14 exclusion of coverage for: 1) property damage caused during construction by work incorrectly
15 performed by the insured's or its subcontractor; and 2) damage caused by the insured following
16 completion of the insured's work.[8] On March 17, 2006 based upon these exclusions and Schmitt's
17 failure to fulfill its liability limiting obligations, NIC denied the defense and indemnity of Schmitt's
18 claim in its entirety. Schmitt Dec., Exh. J.

19     During the arbitration, Gidha claimed that Schmitt did not install a "vapor barrier" or ceiling
20 ventilation to avoid excessive moisture. Ogilvie Dec., Exh. D ¶ C. Schmitt defended by arguing
21 that it was not responsible for the design of the project, with which the arbitrator agreed. Id. ¶ L n.3.
22 Overall, the arbitrator found Schmitt to be 40% liable for the mold damages. Id. at Award.
23 Specifically, the arbitrator found that "[l]eaving the building vacant while Claimant's HVAC
24 Contractor mobilized, coupled with the winter climate, the unsealed slab and the lack of ventilation
25 set the stage for mold growth in the building." Id. Based on this finding, the arbitrator held that
26 "[Schmitt's] contribution to the mold damage in the form of defective gutter installation, exterior
27 flashing defects, the low spot in the Slab-on-Grade, and failure to take a more active role in
28

3

addressing those water incursions of which it became aware is 40%." Id.

The arbitrator found that Schmitt was not responsible for the design of the building, but that Schmitt's work on the gutter installation, roll-up door flashing and the slab-on-grade/sidewalk interface was substandard. Specifically, 15% of the damage was due to gutter defect/roof interface, 10% due to leaking flashing and 15% due to minor leaks and contractor maladministration (negligence). In addition, the arbitrator found that the subcontractors who installed the gutter and flashing were negligent. Finally, the arbitrator found that Atlantic performed work in a substandard manner and that Atlantic's contribution to the moisture in the building was Gidha's responsibility. Id.

NIC now seeks summary judgment on grounds that: 1) it is entitled to void the policies; 2) the policies are in excess of claims of $1 million only; and 3) coverage for damages sought by Gidha are excluded by the policies. Schmitt has filed a cross-motion seeking summary judgment with respect to NIC's duty to defend Schmitt in the underlying Gidha claim.

LEGAL STANDARD

    A.    Summary Judgment

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the

4

1  pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a
2  genuine issue for trial." Fed. R. Civ. P. 56(e).  Mere allegations or denials do not defeat a moving
3  party's allegations.  Id.; Gasaway v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir.
4  1994).  The court may not make credibility determinations, and inferences to be drawn from the
5  facts must be viewed in the light most favorable to the party opposing the motion.  Masson v. New
6  Yorker Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

7         The moving party may "move with or without supporting affidavits for a summary judgment
8  in the party's favor upon all [claims] or any part thereof." Fed. R. Civ. P. 56(a).  "Supporting and
9  opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be
10 admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the
11 matters stated therein."  Fed. R. Civ. P. 56(e).

13     B.    Duty to Defend

14        There is no argument amongst the parties that California law applies.  If an insurer desires to
15 prove it does not have a duty to defend, it must present undisputed facts that eliminate any
16 possibility of coverage.  Montrose Chem. Corp. v. Superior Court, 6 Cal. 4th 287, 300 (1993).  If
17 the insured sues to enforce the insurer's duty to defend a third-party claim against the insured, actual
18 coverage is not required—the insured need only prove facts showing the claim is potentially covered
19 under the policy.  Id.  The duty to defend is therefore broader than the duty to indemnify.  Gray v.
20 Zurich Ins. Co., 65 Cal. 2d 263, 275 (1966).

21        The duty to defend arises whenever the third-party suit against the insured seeks damages on
22 any theory that, if proven, would be covered by the insurance policy.  Montrose Chem., 6 Cal. 4th at
23 300.  A potential or possibility of coverage triggers the defense duty and it need not be shown that
24 coverage is likely or even reasonably likely.  Id. at 299–300.  Any doubt as to whether the facts give
25 rise to a duty to defend is resolved in the insured's favor.  Horace Mann Ins. Co. v. Barberra B., 4
26 Cal. 4th 1076, 1080 (1993).  Finally, in an action in which some claims are potentially covered and
27 others are not, the insurer must mount and fund a defense of the entire action, including those claims

5

for which there is no potential for coverage under the policy.  <u>Buss v. Superior Court</u>, 17 Cal. 4th 35, 48 (1997).

DISCUSSION

The burden of proof is upon NIC to demonstrate no potential for coverage as a matter of law. If there is no potential for coverage, there will be no duty do defend or indemnify.  <u>Montrose Chem.</u>, 6 Cal. 4th at 300.  NIC makes three arguments to demonstrate that there is no potential for coverage. First, NIC claims that the insurance policies are rendered void with respect to the Gidha claim because Schmitt's representations regarding its liability limiting practices in its application for insurance were material misrepresentations.  Second, NIC argues that Schmitt's failure to engage in the liability limiting practices after the policies were issued renders the insurance policy applicable only to claims in excess of $1 million.  Third, NIC argues that the mold and other exclusions exclude all of the claims brought by Gidha.  The court discusses and refutes the first two contentions in turn, reaching the conclusion that damage not caused by Schmitt's subcontractors and that does not fall under an exclusion is covered by the insurance policies.  Finally, alongside its discussion of the third contention, because Gidha had alleged damages that did not fall under a policy exclusion, the court holds that NIC does not have a duty to indemnify even though it did have a duty to defend.

I.      <u>Validity of the Insurance Contracts</u>

Schmitt twice applied for insurance from NIC.  Each time Schmitt represented to NIC that it always engaged in the liability limiting practices listed above.  It is uncontroverted that NIC would not have issued the insurance policies had it known that Schmitt did not, in fact, always do so.  It is also uncontroverted that Schmitt, during the Gidha construction, allowed subcontractors to engage in subcontracting work without fulfilling each of the liability limiting practices.  NIC now claims that Schmitt's representations in the application for insurance were material misrepresentations and therefore NIC did not have to defend the underlying arbitration.  Each prong, materiality and misrepresentation, is discussed in turn.

A.    Materiality

The California Insurance Code provides that an insurer has a right to know everything the proposed insured knows regarding the risks to be assumed. Cal. Ins. Code § 332. Whether a misrepresentation is material is determined "solely by the probable and reasonable inference of the facts upon which the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries." Id. § 334. NIC contends that "[t]he fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality." Merced County Mut. Fire Ins. Co. v. State of California, 233 Cal. App. 3d 765, 772 (1991).

The court agrees that information regarding the liability limiting practices affect the risk to be assumed by the insurer. Whether the insurer will be required to defend or indemnify its insured in an action premised upon acts of the insured's subcontractors certainly affects the insurer's financial exposure. If the insurer does not have to defend or indemnify the insured for the acts of its subcontractors, then the insurance premium will certainly be lower. Thus, information regarding Schmitt's liability limiting practices was clearly material. This is further underscored by the fact that NIC issued the insurance policies to Schmitt with the express understanding that Schmitt would engage in the aforementioned liability limiting practices every time it hired a subcontractor.

B.    Misrepresentation

A representation is false when the facts fail to correspond with its assertions or stipulations. Cal. Ins. Code § 358. The applications for insurance asked about Schmitt's then-current practices regarding the three liability limiting acts. Thus, Schmitt would have made a material misrepresentation if it did not engage in liability limiting practices at the time it applied for insurance, but nevertheless represented that it did. NIC, however, does not present any evidence that Schmitt misrepresented its adherence to liability limiting practices at the time it applied for the insurance policies. There is no evidence submitted that Schmitt had not always engaged in the liability limiting practices as of the date of the applications, April 15, 2003 and April 21, 2004. The

7

only evidence proffered by Schmitt pertains to subcontractors hired by Schmitt during the Gidha construction which began after February 9, 2004. NIC has not submitted evidence that any of these contractors were hired before April 21, 2004. Thus, NIC cannot show that the policies were procured through Schmitt's misrepresentations and/or concealment of material facts from NIC.

The above finding also renders moot the parties' arguments regarding the insured's state of mind when the alleged misrepresentations were made. Furthermore, even if material misrepresentations were made, the remedy sought by NIC is unavailable.

C.    Remedy

NIC can avoid its obligations under the policies by seeking recision of the policies based on a material misrepresentation. NIC, however, is not seeking recision. It seeks to void the policies only with respect to the Gidha claim in order to avoid refunding the policy premiums. Nevertheless, all of its support for this "voiding" remedy discuss only recision.[9] For instance, NIC states that the "voiding of an insuring agreement is a retroactive termination of an insurance policy" such that it acts "ab initio." Def.'s Br. at 16. In fact, NIC specifically states that after an insurance policy is voided on the basis of a material misrepresentation, "all rights of the insured thereunder (except the right to consideration paid in the purchase of the policy) are extinguished." Id. This clearly requires the insurer to refund the policy premiums. Thus, NIC provides no basis for this court to void the policies with respect to the Gidha claim only. In fact, if the policies are held void with respect to the Gidha claim because Schmitt made material misrepresentations in its application for insurance, then there seem to be no circumstances under which the policies would not be voidable by NIC. This would allow NIC to be unjustly enriched to the tune of the policy premium amount because it could retain the premium without ever providing any policy coverage.

In sum, NIC's request for summary judgment due to Schmitt's alleged material misrepresentations is denied for two reasons. First, NIC has not been able to show that Schmitt materially misrepresented itself in the applications for insurance; and second, NIC's sought after remedy is unavailable.

8

## II. NIC's Limitation on Liability

NIC's second argument is that there is no potential for coverage because Schmitt neglected to always engage in the three liability limiting practices after issuance of the policies. Thus, NIC claims, their policy is only applicable to claims in excess of $1 million.

NIC's motivation for requiring its insureds to secure certificates of insurance and endorsements as additional insured was to hold the subcontractors' insurers responsible for risk of loss arising from the subcontractors' work. California courts have held such provisions to be enforceable. Scottsdale Ins. Co. v. Essex Ins. Co., 98 Cal. App. 4th 86 (2002). In Scottsdale, the court held that the insurer was prejudiced by the insured's failure to require its subcontractors have insurance and the insured be named an additional insured in the subcontractors' policies. Id. The court explained that had the insured done so, the insured's vicarious liability for the subcontractors' negligence would be covered by both the insurer's and the subcontractor's policy. Id.

The insured risk here includes liability against Schmitt both for its own wrongdoings and for the wrongdoings of its subcontractors. Liability solely for Schmitt's wrongdoings, however, does not depend upon any of the three liability limiting practices in question. In fact, each of the three practices only limited Schmitt's, and consequently NIC's, liability for Schmitt's subcontractors' wrongs. Acquiring written contracts with subcontractors that have a hold harmless provision in Schmitt's favor would allow Schmitt to disavow liability for the acts of its subcontractors. Similarly, acquiring certificates of insurance specifying that the subcontractor had at least $1 million in liability insurance would allow Schmitt to escape liability for any harm caused by its subcontractors if the cost of the harm was less than $1 million. And finally, having Schmitt designated as an additional insured in each of its subcontractors' insurance policies would serve as an insurance policy for Schmitt for the first million dollars of damage caused by its subcontractors. If the damages were over one million dollars, the NIC policy would provide excess coverage. In sum, these liability limiting practices are not relevant, let alone material, to the insurer's risk calculations regarding Schmitt's own wrongdoings or the risk imposed upon Schmitt for the wrongdoings of others not its subcontractors.

The terms of the policy limitation further reinforce this idea. Paragraph 4 of the independent contractor agreement states NIC's coverage is in excess for "claims against any insured based on work done for or on behalf of any insured." Further, NIC's duty to defend or indemnify does not exist "absent exhaustion of all such contractors' and subcontractor's policies." The subcontractors' policies are meant to primarily insure the subcontractor. Thus, being named as an additional insured only protects NIC's named insured for the subcontractors' wrongs.

This finding is underscored by NIC itself, which states that the additional insured requirement exists to "hold the subcontractors' insurers responsible for risk of loss (for defense and indemnity) arising from the subcontractors' work." Def.'s Br. at 17. In addition, NIC states that "the NIC Independent Contractor endorsement required the named insured to assist in the procurement of other insurance to help cover risks arising from the negligent conduct of the named insured's subcontractors, and to participate in SCHMITT's defense and indemnification." Id. at 19. NIC also states that the purpose of the additional insured requirement is to "enable[] NIC's named insured to hold the subcontractors' insurers responsible for risk of loss for defense and indemnity arising from the subcontractors' work." Def.'s Reply at 8. Finally, NIC admits that the purpose of paragraph 4 applies only if "there is a loss which gives rise to a claim against SCHMITT based on work performed for SCHMITT by a subcontractor." Id. at 10. In sum, all the liability limiting practices affect Schmitt's vicarious liability only.

NIC's coverage for Schmitt's own work remains primary. Scottsdale did not specifically discuss the ramifications of liability limiting requirements on claims against the insured for the insured's own wrongdoing. It held that the insurer was prejudiced by the insurer's failure to be an additional insured on its subcontractors' policies because "[h]ad he done so, the [insured's] vicarious liability for negligence by the subcontractors would be covered both by the Essex policy and the subcontractors' policies." Scottsdale, 98 Cal. App. 4th at 97. The holding did not pertain to acts directly attributable to Essex's insured. Thus, NIC is only partially correct when it states that the requirements for coverage set forth in the NIC Independent Contractor endorsement constitute a condition precedent to coverage. The endorsement does constitute a condition precedent to

10

coverage, but only for coverage for vicarious liability, and if so, only up to $1 million in vicarious liability. The endorsement's purpose is to place NIC's obligation to defend and indemnify Schmitt for the conduct of its subcontractors secondary to that of the subcontractor's liability carrier.

It is uncontroverted that Schmitt did not engage in the liability limiting practices during the time it performed work for Gidha. This failure to act was plainly against the ongoing duties imposed upon Schmitt by the independent contractor endorsement to the policy. Substantial compliance with the same does not have the liability reducing effect as complete compliance and therefore cannot stand as a substitute for complete compliance. Thus, Schmitt was in breach of its contractual agreement.

Schmitt's breach reduces its policy coverage for acts of its subcontractors attributable to Schmitt, but does not completely eliminate the policy coverage. Since NIC's policy was in excess, NIC has no duty to defend or indemnify Schmitt for the work of its subcontractors up to $1 million in costs. The underlying Gidha claim, however, alleged that work done by both Schmitt and its subcontractors were substandard. For instance, as discussed at the summary judgment hearing, Schmitt was in charge of the slab. The Gidha claim alleged excess moisture with respect to the unsealed slab, but Schmitt claimed it had built the slab according to the specifications. This court is not convinced that NIC was not responsible for defending Schmitt against allegations that are later found to be false. Furthermore, Schmitt claimed that the damages were in fact caused by Atlantic, an unaffiliated contractor. Similarly, the court is not convinced that NIC was not responsible for defending Schmitt regarding liabilities caused by an unaffiliated subcontractor. Thus, NIC's motion for summary judgment under this argument is denied.

III.  Exclusions

The above analysis demonstrates that allegations of damages not caused by Schmitt's subcontractors and that do not fall under an exclusion are covered by the insurance policies. Thus, if Gidha had alleged damages not caused by a subcontractor that did not fall under a policy exclusion, NIC would have had a duty to defend. The court now analyzes the various policy exclusions.

### A. The "Mold" Exclusion

The policies issued by NIC to Schmitt excluded coverage for bodily injury and property damages to any property arising out of, resulting from, or contributed to by mold or exposure to mold. The interpretation of an insurance policy is a question of law for this court to decide. Waller v. Truck Ins. Exchange, Inc., 11 Cal. 4th 1, 18 (1995). As such, the plain language of the policy must be respected and "[t]he clear and explicit meaning of [the policy] provisions, interpreted in their ordinary and popular sense . . . controls judicial interpretation." AIU Ins. Co. v. Superior Court, 51 Cal.3d 807, 822 (1990) (internal quotations omitted). The parties agree that there is no decisional law in California interpreting a similar mold exclusion.

Schmitt argues that the mold exclusion language in the policy does not exclude "water damage" or "water intrusion" and therefore any water damage or intrusion that ultimately results in mold growth is covered under the policy. This argument confuses cause with effect. The insurance policy has an exclusion for mold. There is no provision that limits the instances in which the exclusion applies. Thus, if there is a claim against the insured regarding mold, it is excluded. It is irrelevant whether the mold was caused by Schmitt's negligence, Schmitt's intentional acts, acts of unaffiliated third parties, or acts of god. In other words, damage caused by mold is excluded regardless of the underlying circumstances that led to the mold growth. Furthermore, if Schmitt's argument were accepted, then no damages arising out of or resulting from mold would ever be excluded under the terms of the present policies as mold will always be an ensuing loss resulting from a covered loss, namely, water damage.

In the underlying Gidha arbitration, the arbitrator adjudicated that "Schmitt's foreman largely ignored water intrusion" and that "[a]ll water intrusion was conducive to mold growth." Ogilvie Dec., Exh. D at 13. The causal connection, as well as the exclusion, is clear. There are no separate and independent covered perils that led to the damage caused by mold. The arbitrator's award was based on mold remediation, mold evaluation, replacement of the North Wall due to mold damage, and lost rent due to mold. Since all of the arbitrator's awards arose out of and/or resulted

from mold, the policy exclusion applies.  See Fireman's Fund Ins. Co. v. Oregon Cold Storage, 11 Fed. Appx. 969 (9th Cir. 2001).  Accordingly, the court holds that NIC has no duty to indemnify.

Nevertheless, independent of indemnification, the insurer may owe a duty to defend claims potentially covered under the policy, for instance, suits in which any one claim is covered even if others are not and claims for which the insured could reasonably expect coverage.  Montrose Chem, 6 Cal. 4th at 295–96, 300–04.  The insured's duty to defend is not judged on the basis of whether the third-party ultimately wins its lawsuit against the insured.  Rather, it turns upon those facts known by the insurer at the inception of a third-party lawsuit.  Id. at 295.  Thus, if there were a claim against Schmitt claiming water rot or other damage caused by moisture, NIC would be obligated to defend Schmitt.

In the case at bar, Gidha's claim stated that "Schmitt breached the agreement by designing and constructing the building in such a manner as to allow moisture to enter into and accumulate in the interior of the building causing damage and mold growth."  The claim encompasses mold growth and water damage, thereby triggering NIC's duty to defend.  The preliminary defect list contained in Gidha's claim for damages included claims against Schmitt for water damage to the sheetrock, water damage to the interior wall cavities, incorrect installation of the downspouts, and the stucco cracking.  Costa Dec., Exh. K.  Since none of these relate to mold and since Schmitt constructed at least some of the structures at issue, NIC had a duty to defend.  NIC argues, in hindsight, that the damages awarded by the arbitrator were all related to mold.  Though that is true, the same was not known at the time Gidha filed its arbitration claim—Claimant's opening brief in the underlying arbitration alleged damage caused by water stains and moisture damage in addition to mold.  Id. Thus, NIC has not been able to demonstrate that there is no possible scenario under which it would not have to defend Schmitt.

B.   Other Exclusions

NIC claims that it is not obligated to defend Schmitt because the policy excludes coverage for property damage if Schmitt's work was incorrectly performed on it.  This standard applies if the

13

work had not been completed or abandoned. Schmitt admits that typically, there is no coverage for property damage caused by the contractor's own work during operations.

Gidha charged Schmitt with deficiencies in the unsealed slab of the foundation. NIC, however, cannot claim that it was not required to defend Schmitt because at the time Gidha brought its action, it was unknown whether Schmitt's work was incorrectly performed. In fact, in hindsight, it turns out that Schmitt's work was correctly performed because the arbitrator found that the slab was properly constructed under both code and contract and Schmitt was not responsible for the damages claimed to have been caused by the unsealed slab. Ogilvie Dec., Exh. D at ¶ L n.3.

NIC further claims that it need not defend for property damage to "[Schmitt's] work" arising out of it or any part of it and included in the "products-completed operations hazard." Vaughn Dec., Exhs B at 29 &  F at 32. The parties agree that "products-completed operations hazard" provides coverage for damage following completion of the insured's work or operations. The same argument as above applies even if Schmitt had completed its work because it was unknown at the time of the Gidha arbitration whose work was incorrectly performed on the slab.

Therefore, NIC was under an obligation to defend Schmitt with respect to the slab when the Gidha action was filed. In addition, these exclusions do not absolve NIC of its duty to defend Schmitt with respect to non-mold related claims that it personally performed since, again, whose work was incorrectly performed was unknown at the time of the Gidha suit.

Finally, it is also possible that after Schmitt's completed its work, Schmitt's work caused non-mold property damage to the work of others. The exception for Schmitt's work incorrectly performed on any property does not apply to property damage included in the "products-completed operations hazard." The same is true for independent subcontractors' work that causes non-mold property damage to Schmitt's work. Since water damage was claimed, this provision also triggers NIC's duty to defend.

In sum, NIC had a duty to defend the underlying Gidha claim against Schmitt.

IV. Duty of Good Faith and Fair Dealing

In its complaint, Schmitt alleged that NIC's failure to defend the Gidha action and its alleged conduct in investigating and handling the Gidha claim amounts to a breach of the duty of good faith and fair dealings impliedly present in every contract. NIC argues that since it owed no duty or benefits under the policy, the duty of good faith and fair dealing never attached. Since the court has ruled that duties under the policy did attach, NIC's motion for summary judgment on this issue is denied.

V. Evidentiary Issues

Both parties raise evidentiary objections. NIC raises objections to certain portions of the declaration submitted by Richard Schmitt and Schmitt does the same with respect to the declaration submitted by William Vaughn. Paragraph 24 of Richard Schmitt's declaration was relied upon by the court to demonstrate notice to P&C of Schmitt's beliefs as to the nature of the claims against him. As such, these statements are not barred by Federal Rules of Evidence 601, 602, 702, and 801. All other objections are moot because the court did not consider the corresponding evidence in its disposition of the current dispute and, therefore, it need not consider the evidentiary objections.

CONCLUSION

Defendant NIC's motion for summary judgment is DENIED. Plaintiff Schmitt's motion for partial summary judgment is GRANTED.

IT IS SO ORDERED.

Dated: November 1, 2007

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

ENDNOTES

1. Unless otherwise noted, all facts are taken from the Joint Statement of Uncontroverted Facts. See Docket No. 27.

2. Each application for insurance required Schmitt to answer the following questions as part of the contractors supplemental questionnaire. Subparts of question 5 and its answers were:
    c. Do you always collect Certificates of Insurance from subcontractors?
    Yes _X_ No __
        What minimum General Liability limit is required?
        $1 M__
    d. Do you always require subcontractors to name you as an additional insured?
    Yes _X_ No __
    e. Do you have a standard formal written contract with subcontractors?
    Yes _X_ No
        If yes, does it have a hold harmless/indemnification agreement in your favor?
        Yes _X_ No __

3. The policies included the following clause: "WARRANT SUBCONTRACTORS CARRY LIKE LIMITS AND NAME APPLICANT AS AN ADDITIONAL INSURED." Vaughn Dec., Exhs B & F.

4. Property damage was defined by the policies as:
    (a) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
    (b) loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
Vaughn Dec., Exhs B at 30 & F at 33.

5. The independent contractor endorsement to the policies states:
    The insured hereby represents and warrants that:
    1. Commercial general liability insurance coverage for "bodily injury" and "property damage" will be required for all contractors and sub-contractors performing work or operations on behalf of any insured; and the insured shall obtain Certificates of Insurance from all contractors and subcontractors performing work or operations on behalf of any insured. Such insurance will be in effect during the duration of the time work is being performed on behalf of any insured; and that
    2. The insured will be named as an "additional insured" on the required coverages described in Item 1 above and that
    3. The minimum limits and coverages thus required of all contractors and sub-contractors performing work or operations on behalf of any insured shall be:
        REQUIRED LIMIT        COMMERCIAL GENERAL LIABILITY FORM
        $1,000,000                  General Aggregate

    $1,000,000         Products/Completed Operations Aggregate
    $1,000,000         Each Occurrence

  4. Any coverage that might otherwise exist under this policy for claims against any insured based on work done for or on behalf of any insured by a contractor or subcontractor is expressly excess over, and will not contribute with, the insurance required of contractors and subcontractors under this endorsement. No duty to defend or indemnify any insured under this policy for any claims that are or should be covered under the policies required of contractors or subcontractors under this endorsement will exist absent exhaustion of all such contractors' and subcontractor's policies.

  The insured understands and warrants that this insurance policy has been issued upon these representations and warranties.

6. Defendant NIC requests that the court take judicial notice of Plaintiff's first amended complaint and exhibits on file regarding this action as brought in California state court. Since this request is not met with any opposition, the court takes judicial notice of the amended complaint and exhibits pursuant to California Evidence Code § 452(d)(1) (judicial notice may be taken of records of any court of this state).

7. The mold exclusion to both policies states:
  This insurance does not apply to:
  1. "Bodily injury", "property damage" . . . arising out of, resulting from, or caused by or contributed to by any fungus, mildew or mold or exposure to any fungus, mildew, or mold; or
  2. The costs of abatement, mitigation, removal or disposal of any fungus, mildew or mold.
  This exclusion also applies to:
  1. Any supervision, instructions, recommendations, warnings or advice given or which should have been give in connection with the above; and
  2. Any obligation to share damages with or repay someone else who must pay Damages because of such injury or damage, either in equity or in tort.

8. The policies state:
  2. Exclusions
  This insurance does not apply to: . . .
    j. Damage to Property
    "Property damage" to: . . .
      (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
      (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
    Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard" . . .
  (l) Damage to your work
  "Property damage" to "your work" arising out of it or any part of it and included in

17

> the "products - completed operations hazard".
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

The policies then define "products - completed operations hazard" as:

> "Products-completed operations hazard":
> (a) Includes all . . . "property damage" occurring away from premises you own or rent and arising out of . . . "your work" except: . . .
> (2) work that has not yet been completed or abandoned.

Vaughn Dec., Exhs B at 29 & F at 32.

9.  It is also unclear to the court why NIC did not pursue this so-called "voiding" remedy before it was sued by Schmitt.